NOTICE
Decision filed 01/21/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 240980-U

NO. 5-24-0980

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* BLAISE M., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 22-JA-95 |
| | ) | |
| Danielle S., | ) | Honorable |
| | ) | Robert E. Jacobson, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Boie and Moore concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court erred in terminating Mother's parental rights where the best interest determination was against the manifest weight of the evidence.

¶ 2   The respondent, Danielle S. (Mother), appeals from the circuit court of Champaign County's September 9, 2024, order terminating her parental rights. For the reasons set forth below, we reverse.

¶ 3                          I. BACKGROUND

¶ 4   Mother is the biological mother of Blaise M. (B.M.), born on November 9, 2015. Mother cared for B.M. until B.M. tested positive for a sexually transmitted disease when he was two years old. B.M. was then placed with his biological father, Alec Moore (Father), by the Department of

Children and Family Services (DCFS). Mother and Father were not in a relationship, and Mother was absent from B.M.'s life for four years. Father is not a party to this appeal.

¶ 5    A DCFS intact case was opened on May 25, 2022, to address concerns that B.M. had inadequate shelter. B.M. and Father lived in a garage without a toilet and possibly no functional heat. DCFS did not remove B.M. from Father's care. On September 14, 2022, B.M., without adult supervision, ran into the street to board the school bus without looking for oncoming traffic. School officials contacted DCFS and additionally reported that they would regularly feed and bathe B.M. at school. A DCFS investigator met with Father and found Father's home to be unsanitary and smelled of feces. B.M. was removed from Father's care and placed with a foster family. Mother was unable to exercise custody of B.M. because of the previous DCFS investigation indicating the finding of abuse.

¶ 6    The State filed a petition for adjudication of abuse, neglect, or dependency pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)) based on B.M. residing in unsafe living conditions and inadequate supervision, and section 2-3(1)(a) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(a) (West 2022)) where Father failed to provide necessary support or care for B.M.'s well-being. The circuit court entered an adjudicatory order on November 29, 2022, finding B.M. abused or neglected. A dispositional order was entered on January 9, 2023. The guardianship administrator of DCFS received custody and guardianship of B.M.

¶ 7    DCFS created a family service plan on March 23, 2023, with the goal of having B.M. return to Mother's home within 12 months. The service plan required Mother to participate in individual counseling, complete parenting classes, complete a substance abuse assessment and cooperate with

drug testing, complete a sex offender risk assessment, and maintain employment and safe and stable housing.

¶ 8     On November 1, 2023, the circuit court held a permanency hearing and considered Mother's service plan, as well as her efforts and progress towards B.M. returning home. The circuit court issued a written order the same day and found that the appropriate permanency goal was for B.M. to return home within 12 months. The circuit court additionally found that Mother had made reasonable and substantial progress and reasonable efforts. After the November 1, 2023, permanency hearing, Mother was no longer required to complete drug testing.

¶ 9     DCFS filed an additional permanency report with the circuit court on February 8, 2024, and alleged that Mother was no longer making satisfactory progress or reasonable efforts. DCFS's permanency report included information indicating there were environmental concerns with Mother's living arrangement. Mother lived with and worked for her father. Mother had attempted to locate rental housing but failed to provide financial information, and Mother had not provided pay stubs to DCFS to verify employment.

¶ 10     The February 2024 permanency report also indicated that Mother was in a dating relationship with Matthew Todd. Mother's drug testing requirement resumed after Todd was arrested in November of 2023. Mother also had been arrested, along with Todd, on three occasions in December of 2023, for methamphetamine possession. Mother was referred for a new drug evaluation and assessment. Additionally, Mother repeatedly cancelled counseling sessions or failed to show for counseling sessions from November of 2023 to February of 2024.

¶ 11     The State filed a motion to terminate parental rights on February 13, 2024, alleging that Mother was unfit because she failed to maintain a reasonable degree of interest, concern, or responsibility as to B.M.'s welfare; she failed to make reasonable efforts to correct the conditions

3

that were the basis for the removal of B.M.; and she failed to make reasonable progress toward the return of B.M. during any nine-month period following the adjudication of abuse or neglect. The specific nine-month period alleged was from May 14, 2023, to February 14, 2024.

¶ 12    The circuit court held a fitness hearing on July 8, 2024, and July 9, 2024. The State presented Branden Simms, a patrol deputy for the Douglas County Sheriff's Office, as its first witness. Simms testified that on December 4, 2023, Mother was involved in a traffic stop where she was the driver of a vehicle and Matthew Todd was a passenger. The vehicle was searched for illegal substances and 0.2 grams of methamphetamine, along with a glass pipe, were found underneath the center console of the vehicle. Simms testified that Mother claimed that she was not the owner of the vehicle or the illegal drugs.

¶ 13    Dalton Donnals, a police officer with the city of Tuscola, testified to a second traffic stop that occurred on December 7, 2023. Mother was driving a Ford truck and failed to signal numerous times. Todd was a passenger. Donnals testified that Todd had a small amount of raw cannabis on his person which was a violation of the Cannabis Control Act and that he observed behaviors by Mother which he believed were associated with drug use. Donnals searched the truck for illegal drugs and located methamphetamine in a clear plastic baggie underneath the passenger seat. Donnals additionally searched Mother's purse and found blackened glue sticks and a butane torch lighter. Donnals testified that those items were associated with methamphetamine use. Donnals questioned Mother about the glue sticks, and she responded that the glue sticks were used for her craft projects. Mother denied using methamphetamines.

¶ 14    Kathleen Peters testified that she was employed by the Center for Youth and Family Solutions (CYFS) as a mental health therapist. Peters was assigned to work with Mother from November of 2023 to the end of February of 2024, during the time period that Mother's regular

4

therapist was on maternity leave. Mother did not have to travel to attend counseling sessions because they were held over a video platform. Mother missed four of the six counseling sessions with Peters, and Peters testified that Mother was not progressing towards her goals. Peters additionally admitted that Mother was apprehensive about working with a new counselor. Mother resumed with her original therapist after her therapist returned from maternity leave.

¶ 15    Janessa Hays, employed by CYFS as Mother's caseworker and as a supervisor, testified to Mother's service plan. Mother was required to cooperate with substance abuse, parenting, counseling, and "domestic violence"[1] services. Mother cooperated with completing service requirements and completed her parenting and sex offender risk assessment requirements. In November of 2023, Mother's visitation time was on track to increase, and Mother had completed her substance abuse requirements. Mother had not been consistent with attending drug tests, but Mother never had a positive drug test while B.M. was in care. Hays was unable to schedule drug testing in Sullivan, Illinois, where Mother lived, and Mother was required to drive 30 minutes to Charleston, Illinois, for her random drug screens. Hays testified that Mother had a difficult time completing the drug testing requirement because she did not have transportation.

¶ 16    Hays also testified that Mother had been in a dating relationship with Todd, who had an open, unrelated DCFS case and an arrest record for illegal substance abuse. Mother maintained at least two jobs while Hays was Mother's caseworker, including a job working for her father. Mother's father also employed Todd, and he allowed Todd to live on his property. Hays had informed Mother that B.M. would not be returned to Mother's care if Todd remained at Mother's

---

[1]The service plan included that Mother was required to complete a sex offender risk assessment and did not specify domestic violence services.

5

home. Hays had additionally viewed Mother's living arrangements during a home safety assessment and was concerned with the amount of clutter in the home.

¶ 17    Mother had informed Hays in May of 2023 that Mother ended her relationship with Todd. In November of 2023, Todd was arrested in front of Mother's house and Hays believed that Mother remained in a relationship with Todd. Because of Todd's arrest, Mother was required to reengage with substance abuse services and visitation never increased. Hays additionally testified that Mother had been arrested with Todd in December of 2023.

¶ 18    Hays also reported that Mother maintained an interest in B.M.'s well-being. Hays observed Mother's visitation with B.M. Mother had love and affection for B.M. and B.M. loved Mother. Hays had no concerns with Mother's ability to care for B.M. during visitation. Hays believed that Mother made reasonable efforts and was making reasonable progress when she was Mother's caseworker.

¶ 19    Millicent Abernathy replaced Hays as Mother's caseworker on September 18, 2023. Abernathy testified that Mother had completed most of her service plan requirements before Abernathy took over as Mother's caseworker. Abernathy additionally testified that in February of 2024, B.M. was not close to being returned to Mother due to Mother's inadequate housing and her failure to appear for drug testing.

¶ 20    In October of 2023, Abernathy completed a home safety check and discovered environmental concerns. Boxes were stacked in front of the front door and windows. Some rooms upstairs were not accessible. The room designated for B.M. was full of clutter and the windows were not accessible, which was a safety concern. Mother was working on relocating and had applied for housing services without a referral from CYFS.

6

¶ 21    Mother failed to appear for 13 of the 13 requested drug drops from November 7, 2023, to February 14, 2024. Mother was required to complete her drug testing in Charleston, Illinois. Abernathy was aware that Mother did not have reliable transportation, and there was no public transportation between Sullivan, Illinois and Charleston, Illinois. CYFS did not provide transportation for Mother to complete her drug testing.

¶ 22    Abernathy additionally testified that Mother regularly attended counseling appointments until her therapist was unable meet due to her maternity leave. Abernathy testified that Mother was uncomfortable with the temporary counselor appointed to her case. Mother resumed counseling when her original counselor returned from maternity leave. Abernathy also testified that Mother's visitation did not increase in November of 2023 because Todd lived at Mother's residence. Mother would fall asleep during the weekly two-hour-long visitation sessions with B.M. B.M. would eat to the point where he would vomit, and Mother would not prevent B.M. from overeating.

¶ 23    During closing arguments, the State conceded that it had not proven by clear and convincing evidence that Mother was unfit for failing to maintain a reasonable degree of interest or concern; however, the State argued that Mother failed to maintain a reasonable degree of responsibility. The State additionally conceded that Mother had made reasonable efforts.

¶ 24    The State argued that Mother was unfit for failing to make reasonable progress towards the return of B.M. to her care. Mother never progressed with visitation, fell asleep during visitation, her housing situation was unsatisfactory, and Mother stopped participating in counseling services. The State further argued that Mother was not compliant with her substance abuse requirements where she failed to participate in random drug screens after being arrested twice in one week for possession of methamphetamine.

¶ 25     Mother argued that the State had not met its burden of proof and had not proven by clear and convincing evidence that Mother was unfit. Mother argued that she had completed parenting classes, a sex offender risk assessment, and a substance abuse assessment. Mother was not required to engage in specific treatment and Mother never tested positive for illegal substances. Mother was attending counseling sessions and only missed sessions when her therapist was on maternity leave.

¶ 26     Mother further argued that the concerns raised were based on issues with Todd, but the State had not provided evidence regarding why Todd's presence was a concern. Mother had transportation issues that prevented her from accessing drug drops and CYFS failed to provide transportation. No evidence was presented that the methamphetamine found during the December arrests belonged to Mother. Mother additionally argued that she was working on finding alternative housing.

¶ 27     The circuit court found that the State had not met its burden on the allegation that Mother failed to maintain a reasonable degree of interest, concern, or responsibility as to B.M.'s welfare and the allegation that Mother failed to make reasonable efforts to correct the conditions that were the basis for the removal of B.M. The circuit court considered that Mother had been making progress during the first few months of the nine-month period following the adjudication of abuse or neglect, but she was further from that goal at the end of the nine-month period than the beginning. Mother was found unfit as the State had proven by clear and convincing evidence that Mother failed to make reasonable progress toward the return of B.M.

¶ 28     Abernathy prepared a best interest report that was filed on August 8, 2024, that listed the best interest factors. The report also provided that B.M. was in the third grade and had an Individual Education Plan (IEP). He participated in speech therapy, occupational therapy, and physical therapy. B.M.'s foster placement changed three times after he was brought into care. B.M. had

behavioral issues in foster care, such as refusing to follow directions, cursing, and lying. On November 17, 2023, B.M. was placed with his current foster mother and foster sister in a traditional foster home in Champaign, Illinois. Abernathy reported that B.M. was doing well in the current foster placement but had continual behavioral concerns. B.M. had experienced trauma from placement changes and from not being able to return home. He was enrolled in counseling to address his feelings and behaviors.

¶ 29    The best interest report included that B.M.'s foster mother was willing to provide permanency for B.M. The report addressed B.M.'s identity and his background and ties, including familial, cultural, and religious and included that B.M.'s foster mother would address those factors by allowing Mother to continue to have contact with B.M. B.M.'s foster mother would allow B.M. to maintain a relationship with Mother after Mother's rights were terminated. Abernathy also reported that the foster placement provided adequate food, shelter, and safety, without providing any details regarding B.M.'s living arrangements.

¶ 30    The best interest report additionally included that Mother was employed full time, continued to engage in therapy and had addressed domestic violence issues, completed parenting classes, and completed a sex offender assessment. Mother had been noncompliant with drug screens and was found not guilty of possession of methamphetamine for the December of 2023 arrests. She had moved from her father's residence and was residing in a mobile home which had not been inspected. Additionally, B.M. had a strong bond with Mother, loved Mother, and had expressed that he wanted to live with Mother and his foster mother.

¶ 31    An addendum to the best interest report was filed on September 4, 2024, and was prepared by Abernathy. Abernathy reported that Mother stated that her home was not ready for a home safety check and additionally repairs were needed for the home to be habitable. Mother

9

additionally reported that she was working at a restaurant, would be purchasing a car on September 4, 2024, continued to attend therapy, and engaged in visitation. Mother had not completed a drug drop since May 3, 2024.

¶ 32    The circuit court held a best interest hearing on September 9, 2024. The State did not present any witnesses and relied on the best interest report and addendum prepared by Abernathy.

¶ 33    Mother was the only witness to testify during the best interest hearing. Mother testified that she was working full time in a factory in Arcola, Illinois. Mother moved from her father's home and had stopped contacting Todd. She lived with friends in Camargo, Illinois, while she was renovating a mobile home. The house where Mother was living with friends had an extra bedroom for B.M., and an 11-year-old boy lived at the house. DCFS had not performed a safety check on the home. Mother additionally owned a functional car and had transportation to attend appointments.

¶ 34    Mother testified that she was regularly attending counseling and that she had not used illegal drugs since 2021. She had completed a substance abuse assessment, and no treatment was recommended. Mother decided to meet with a substance abuse counselor monthly, even though it was not required. Mother testified that she had changed for the better because of therapy and had realized that living with her father was "not so great."

¶ 35    Mother additionally testified that she was familiar with B.M.'s health issues. He had developmental delays, and Mother had learned how to handle B.M.'s issues. B.M. used to become frustrated and struggled with communication. Mother testified that she was patient and had a better understanding of how to communicate with B.M. She loved B.M., and B.M. loved her and wanted to live with Mother. Mother testified that B.M. had asked her to "ask my boss" for additional visitation time. Mother testified that it would be traumatizing and difficult for B.M. to understand

10

if Mother's parental rights were terminated. Mother additionally testified that she wanted the opportunity to take B.M. to school and doctor's appointments. Mother additionally wished to interact with B.M. full time and spend holidays together.

¶ 36    The circuit court considered the best interest report and addendum and Mother's testimony. The circuit court found that there were a number of factors that were in favor of both the foster parent and Mother. Mother and B.M. were bonded and loved each other. The foster parent was able to provide physical safety, food, clothing, and shelter, but Mother was unable to provide for B.M. Mother had been more of a presence throughout B.M.'s life in terms of developing B.M.'s identity. B.M. was attached to Mother and his foster mother. B.M. had a sense of familiarity with both Mother and his foster mother. The circuit court found that the permanence factor weighed heavily in favor of terminating Mother's parental rights. B.M. had expressed that he wished to move in with Mother. The circuit court additionally found that there were always risks involved with being in foster care and B.M. risked returning to foster care if he returned to Mother's care. After considering the best interest factors, the circuit court found that the State had proven by a preponderance of the evidence that it was in B.M.'s best interest for Mother's parental rights to terminate. A formal written order was also entered on September 9, 2024, terminating Mother's parental rights. This appeal followed.

¶ 37                                    II. ANALYSIS

¶ 38    On appeal, Mother argues that the circuit court erred in terminating her parental rights. Mother argues that both the fitness and the best interest determinations were against the manifest weight of the evidence.

¶ 39    "A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure." *In re B'Yata I.*, 2013 IL App (2d)

11

130558, ¶ 28. Termination of parental rights proceedings are governed by the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). A petition to terminate parental rights is filed under section 2-29 of the Juvenile Court Act, which delineates a two-step process to terminate parental rights involuntarily. 705 ILCS 405/2-29(2) (West 2022). The State must first establish, by clear and convincing evidence, that the parent is an unfit person under one or more of the grounds enumerated in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). 705 ILCS 405/2-29(2), (4) (West 2022); *In re J.L.*, 236 Ill. 2d 329, 337 (2010). Because each of the statutory grounds of unfitness is independent, the circuit court's finding may be affirmed where the evidence supports a finding of unfitness as to any one of the alleged grounds. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). If the circuit court finds a parent to be unfit, then the cause proceeds to a determination of whether it is in the best interest of the child for the parent's rights to be terminated. 750 ILCS 50/1(D) (West 2022); *In re M.J.*, 314 Ill. App. 3d 649, 655 (2000).

¶ 40 Each case concerning parental fitness is unique and must be decided on the particular facts and circumstances presented. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). The circuit court's finding of unfitness is given great deference because it has the best opportunity to view and evaluate the parties and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). The circuit court's factual findings will not be reversed unless they are against the manifest weight of the evidence. *In re M.J.*, 314 Ill. App. 3d at 655.

¶ 41 The State's motion to terminate Mother's parental rights alleged that Mother was unfit for failing to maintain a reasonable degree of interest, concern, or responsibility as to B.M.'s welfare (750 ILCS 50/1(D)(b) (West 2022)); Mother failed to make reasonable efforts to correct the conditions that were the basis for B.M.'s removal (750 ILCS 50/1(D)(m)(i) (West 2022)); and that

Mother failed to make reasonable progress toward the return of the B.M. within nine months following the adjudication of neglect (750 ILCS 50/1(D)(m)(ii) (West 2022)).

¶ 42 The circuit court found that Mother was unfit solely based upon Mother's failure to make reasonable progress. See 750 ILCS 50/1(D)(m)(ii) (West 2022). "Reasonable progress" is an objective standard focused on the goal of returning the child to the parent. *In re D.D.*, 309 Ill. App. 3d 581, 589 (2000). Progress is measured by the parent's compliance with the court's directives, services plans, or both and requires the parent to make measurable or demonstrable movement toward the reunification goal in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067.

¶ 43 When determining whether Mother has made reasonable progress towards the return of her children, the circuit court only considers the evidence occurring during the relevant nine-month period. *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 68. Section 1(D)(m) requires the State to file a pleading that specifies the nine-month period or periods it relied on in its petition to terminate parental rights. 750 ILCS 50/1(D)(m) (West 2022). Here, the nine-month period specified by the State was from May 14, 2023, to February 14, 2024.

¶ 44 B.M. was brought into care because he was residing in an environment injurious to his welfare due to unsafe living conditions at Father's house, inadequate supervision, and because Father failed to provide necessary support and care for B.M.'s well-being. Mother was unable to exercise custody of B.M. when B.M. was removed from Father's care because of an indicated finding of abuse when B.M. was two years old.

¶ 45 Mother's service plan was created to assist Mother's reunification with B.M. Her plan required participation in individual counseling, completion of parenting classes, completion of a substance abuse assessment and cooperation with drug testing, and completion of a sex offender

13

risk assessment. Mother was also required to maintain employment and obtain safe and stable housing.

¶ 46    Mother initially was making progress on the return of B.M. to her care. Mother satisfactorily completed parenting classes, a substance abuse assessment, and the sex offender risk assessment. Mother's drug testing requirement ceased in November of 2023, and her caseworker considered increasing visitation time.

¶ 47    However, in December of 2023, Mother was arrested twice in one week for possession of methamphetamines while driving a vehicle with her boyfriend, Todd. As a result of these arrests, Mother was required to resume random drug testing. Mother failed to appear for numerous drug tests. We note that Mother did not have reliable transportation and public transportation was unavailable. DCFS failed to assist Mother with transportation to attend those tests. Additionally, Mother was ultimately found not guilty of the possession charges.

¶ 48    Mother, however, ceased making progress with her service plan during the last three months of the nine-month period. Mother stopped attending counseling sessions which were available on a video conference platform from Mother's home. Mother had previously informed her caseworker that she was ending her relationship with Todd, who had an open DCFS case and a history of drug use. Mother was arrested with Todd and continued to live at the same property with Todd. A home safety check revealed excessive clutter, which raised safety concerns. Mother had not made progress on obtaining safe and stable housing. The caseworker also testified that Mother would fall asleep during the weekly two hours of visitation with B.M. During visitation, B.M. had issues with overeating, which Mother did not stop. We find that the evidence demonstrated that Mother was unfit because she had not made reasonable progress towards the reunification of B.M. during the nine-month period.

14

¶ 49 The circuit court proceeds to the best interest hearing after finding a parent unfit and determines whether it is in the best interest of the child for the parent's rights to be terminated. 750 ILCS 50/1(D) (West 2022); *In re M.J.*, 314 Ill. App. 3d at 655. At this stage of the proceeding, the circuit court's focus shifts to the best interests of the child and away from the rights of the parent. *In re P.S.*, 2021 IL App (5th) 210027, ¶ 30. "The parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *In re D.T.*, 212 Ill. 2d at 364.

¶ 50 The State is required to prove by a preponderance of the evidence that it is in a child's best interest to terminate parental rights. *In re B.B.*, 386 Ill. App. 3d 686, 699 (2008). A finding that termination is in the child's best interest will not be reversed unless it is contrary to the manifest weight of the evidence. *In re M.F.*, 326 Ill. App. 3d 1110, 1116 (2002). A determination is against the manifest weight of the evidence only if the facts clearly demonstrate that the court should have reached the opposite result. *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002).

¶ 51 When determining the child's best interests, the circuit court is required to consider, in the context of the child's age and developmental needs, the following:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments, including:

15

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." 705 ILCS 405/1-3(4.05) (West 2022).

"While all of the above-cited factors must be considered, no factor is dispositive." *In re Austin W.*, 214 Ill. 2d 31, 50 (2005). Additionally, the circuit court's determination regarding the evidence of the parent's conduct occurring outside of the nine-month period may be introduced during the best interest hearing if a parent is found unfit under section 1(D)(m). *In re D.L.*, 191 Ill. 2d 1, 12 (2000).

¶ 52 The best interest report identified the best interest factors but did not thoroughly apply those factors to Mother or B.M.'s foster mother. For instance, the report was silent on whether Mother was able to provide food, shelter, health, and clothing. While the report stated that B.M.'s

foster mother was able to adequately provide those needs to B.M., no details were provided to explain B.M.'s living arrangements at his foster mother's home. The State did not present any witnesses at the best interest hearing to support or explain the conclusions provided in the best interest report.

¶ 53    The report additionally included multiple factors that were in Mother's favor. B.M. had a strong bond with Mother. B.M. had expressed that he wished to be with Mother. B.M. had lived in three different foster homes since being in care and continued to exhibit behavioral issues in foster care. According to Abernathy, B.M. had experienced trauma from the placement changes and from not being able to return home. The best interest report also addressed B.M.'s identity and his background and ties, including familial, cultural, and religious, and concluded that B.M.'s foster mother would address those factors by allowing Mother to continue to have contact with B.M. even if Mother's rights were terminated.

¶ 54    Mother was the only witness at the best interest hearing, and she testified that terminating her parental rights would be traumatizing for B.M. Mother expressed that she loved B.M. and that B.M. loved Mother and wanted to live with Mother. B.M. wanted to spend more time with Mother and requested that visitation time increase.

¶ 55    Mother additionally testified that she had continued to make progress on her service plan after the fitness hearing. Mother participated in counseling and testified that she had not used illegal substances for several years. Mother had moved from her father's house, away from Todd, and she was found not guilty for the possession charges. Her relationship with Todd and the arrests had been the catalysts for subsequent drug testing. Mother additionally had sought monthly drug treatment counseling even though she was not required to participate in drug treatment services based on her assessment.

17

¶ 56    Mother had full-time employment, transportation, and testified that she was able to care for B.M.'s medical needs. Mother was residing in a home with an extra bedroom for B.M. Another child, close to B.M.'s age, also lived at the property. Mother additionally expressed interest in being involved with B.M.'s education. Mother had exhibited progress outside of the nine-month period used to determine fitness.

¶ 57    Mother's testimony provided information that was not included in the best interest report. The State did not present any witnesses to counter Mother's testimony and failed to refute the favorable findings toward Mother in the best interest report. The evidence presented at the best interest hearing demonstrated that the best interests of B.M. favored a finding that Mother's rights not be terminated. Therefore, the circuit court should have reached the opposite result. The circuit court's best interest decision was against the manifest weight of the evidence.

¶ 58                                III. CONCLUSION

¶ 59    After reviewing the minimal evidence presented by the State during the best interest hearing, we reverse the circuit court's order terminating Mother's parental rights.

¶ 60    Reversed.