2025 IL App (1st) 250122-U

No. 1-25-0122 & 1-25-0200 (consolidated)

First Division
November 17, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* C.B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 20 JA 8 |
| v. | ) | |
| | ) | |
| Chanelle J. and Charnell B., | ) | Honorable |
| | ) | Diane Pezanoski, |
| Respondents-Appellants). | ) | Judge, Presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court's termination of the parents' parental rights is affirmed where the court's unfitness findings as to father and best interest findings as to mother were not against the manifest weight of the evidence.

¶ 2    Respondents-appellants Chanelle J. and Charnell B. are the biological parents of C.B., a minor. Following a bifurcated hearing, on January 14, 2025, the circuit court of Cook County terminated the rights of both parents as to C.B. Both mother and father appealed from that order,

and their appeals have been consolidated before this court. In case number 1-25-0200, Charnell, C.B.'s father, argues that the trial court erred in the termination of his parental rights where the court's findings of unfitness were against the manifest weight of the evidence. In case number 1-25-0122, Chanelle, C.B.'s mother, argues that the trial court erred in the termination of her parental rights where the court's finding that termination was in C.B.'s best interest was against the manifest weight of the evidence. For the reasons that follow, we affirm.

¶ 3                                      I. BACKGROUND

¶ 4                      A. Proceedings Prior to Termination Hearing

¶ 5      C.B., a male child, was born on September 18, 2019, and, when he was four months old, was taken into protective custody based on allegations that Chanelle tested positive for cocaine while pregnant and failed to take the infant to medically necessary appointments after his bloodwork indicated he had a sexually transmitted infection. The State's January 3, 2020 petition for adjudication of wardship for C.B. asserted that he was neglected, abused, and in an environment injurious to his welfare, pursuant to section 405/2-3 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a)-(b), (2)(ii) (West 2024)). In support, the petition specifically alleged the following:

> "Mother was residing at the Women's Treatment Center at the time of the minor's birth. Mother had previously tested positive for cocaine while pregnant. Minor was diagnosed with a communicable disease. Mother has missed several appointments at the hospital to treat minor's condition. Failure to comply with medication regimen could lead to nerve, nasal and bone damage. In some rare cases, failure to comply with medication could lead to death. Mother and minor's whereabouts are unknown. Father's identity and whereabouts are unknown. Paternity has not been established."

¶ 6 An affidavit from a Department of Children and Family Services (DCFS) investigator supporting the allegations was attached to the petition. On the same day, the State also filed a motion for temporary custody. That day, the trial court entered an order, finding that probable cause existed to support the State's petition and granting temporary custody with the right of placement to DCFS. On March 4, 2020, the court entered a paternity order, finding that Charnell was C.B.'s biological father based on DNA testing.

¶ 7 On November 10, 2020, the trial court entered an adjudication order, finding C.B. was abused or neglected for "lack of care" and "injurious environment." On January 22, 2021, a dispositional order was entered, finding Chanelle and Charnell unable to care for C.B., adjudicating C.B. a ward of the court, and placing him in the custody of DCFS with right to placement. A permanency order was also entered that day, finding that neither parent had made substantial progress toward reunification and setting a goal of return home pending status hearing.

¶ 8 On July 28, 2022, the trial court changed the permanency goal from return home to substitute care pending determination on termination of parental rights. On January 11, 2023, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption based on allegations that C.B.'s parents were unfit and that it was in C.B.'s best interest to be adopted by his foster mother. On July 18, 2023, the State filed a supplemental petition for the appointment of a guardian with the right to consent to adoption, which listed sections 1(D)(b), (m), and (n) of the Adoption Act (750 ILCS 50/1(D)(b), (m), (n) (West 2022)) as grounds for termination. The State alleged the following specific 9-month time frames for lack of substantial progress under ground (m) for both parents: November 10, 2020 until August 10, 2021; August 10, 2021 until May 10, 2022; and/or April 10, 2022 until January 10, 2023.

¶ 9                                 B. Unfitness Hearing

¶ 10    The unfitness portion of the termination proceeding was held over the course of two days: September 16, 2024 and December 10, 2024. The court first took judicial notice of all the prior proceedings in this case. The following evidence was then adduced at the hearing.

¶ 11                                1. Jasmine Noggins

¶ 12    Jasmine Noggins, previously a DCFS child welfare specialist, provided case management for C.B. from February 2020 to October 2020. With both parents' participation, Noggins conducted an integrated assessment, which was completed on April 28, 2020. The integrated assessment recommended the following reunification services for both parents: individual therapy, random drug drops (toxicology screens), and participation in the nurturing parenting program (NPP). It was also recommended that Chanelle complete a substance abuse assessment. However, due to the COVID-19 pandemic and the parents' residing in Champaign, Illinois, at the time, the referral process for these services was delayed until July 2020.

¶ 13    During Noggins' assignment to the case, the parents were allowed supervised visits with C.B. In July 2020, based on Facebook posts and phone calls from family members, Noggins became concerned that the parents were having unsupervised visits, and she spoke with the parents in August regarding her concerns. Also in August, during a phone call with Chanelle, Noggins asked to speak with the caregiver who was supervising the visit, but Chanelle informed her that the caregiver was asleep. Noggins considered that an unsupervised visit. On cross-examination, Noggins stated that she never supervised any of the visits, but she had no concerns as to the safety of C.B., only about the unsupervised contact.

¶ 14    As of October 2020, neither parent had completed any reunification services, and neither parent had made sufficient progress for her to recommend either supervised visits or C.B.'s return to either parent's care.

¶ 15                                    2. Erica Foster

¶ 16    Erica Foster, a DCFS child welfare specialist, provided case management for C.B. from October 2020 through November 2021. At the time she was assigned, neither parent had engaged in any of their respective services. She explained that when an individual does not follow-up with a referral within 60 days, the referral will expire, a caseworker will need to provide a new referral, and the parent will need to sign a consent to complete the referral. In February 2021, Foster provided new referrals for the parents' recommended services.

¶ 17    As to visitation, Foster testified that the parents were permitted supervised visitation twice per week for four hours each time, amounting to eight visits per month. In November 2020, C.B. was moved closer to his parents, who were residing in Champaign. Between February 2021 and November 2021, the parents did not consistently visit C.B. On average, they would attend a supervised visitation three times per month. According to Foster, in May and June 2021, the parents did not make any visits. However, on cross-examination, she confirmed that her report indicated that Charnell visited one time in May and three times in June. She also confirmed that some visits were cancelled in July due to transportation issues, and at some point, the parents tested positive for COVID-19 and visits were subsequently cancelled for that reason.

¶ 18    In July 2021, DCFS decided to move C.B. back to Chicago because of the parents' inconsistent visitation. During cross-examination, Foster testified that there were issues with the foster parent in Champaign which was also a factor in the decision to move C.B. back to Chicago. During Foster's assignment to the case, neither parent was recommended for unsupervised visitation with C.B. On cross-examination, Foster confirmed that the agency providing individual therapy for both parents had an extensive waiting list.

¶ 19    As to Charnell, Foster testified that he did not make himself available to sign the consents for the new referrals until June 2021. Charnell completed parenting classes in September 2021. During the time she was assigned as the caseworker, Charnell did not engage in individual therapy. During that time, Charnell was also expected to complete random drug drops twice per month. Foster explained to Charnell the procedure for the random drug drops multiple times. He did not complete any drug drops from November 2020 to September 2021. However, from September 2021 to November 2021, Charnell completed his drug drops, all yielding negative results.

¶ 20    As to Chanelle, Foster testified that she began engaging in individual therapy in August 2021 and continued throughout the period of Foster's assignment on the case. Chanelle also completed parenting classes in May 2021. Chanelle was expected to complete random drug drops weekly, and Foster explained the procedure to her multiple times. Chanelle's February 24, 2021 toxicology screening yielded a positive result for alcohol and methadone; however, Chanelle was not recommended at that time for further substance abuse treatment. Between February 2021 and November 2021, Foster testified that Chanelle completed drug drops approximately twice per month. According to Foster, DCFS considered a missed drug drop as a positive drop.

¶ 21                                3. Ally Dent

¶ 22    Ally Dent testified that she was assigned to C.B.'s case as a DCFS case manager from November 2021 to October 2023 and as a supervisor from then until March 2024. At the time she was assigned, both parents needed to continue with random drug drops and complete individual therapy. In February 2022, Dent provided a new individual therapy referral for Charnell, but he remained on the waitlist for several months. Chanelle was already engaged in therapy when Dent was assigned. Chanelle did not complete any drug drops in November or December of 2021.

¶ 23    On January 28, 2022, Charnell completed a drug drop. Dent explained that the results of any drug drops are maintained on DCFS's online case management system. She identified a printout of the toxicology results from Charnell's drug drop on that date. Charnell's counsel objected to this printout being admitted into evidence on the basis of foundation. The court overruled the objection, and the printout was admitted into evidence. The printout showed that Charnell tested positive for cocaine on that date.

¶ 24    Chanelle completed a drug drop on January 31, 2022, and her counsel similarly objected to the admission of a printout showing the results of that drug screen. The court again overruled the objection. The printout indicated that Chanelle tested positive for cocaine on that date.

¶ 25    Dent testified that, based on the results from those two drug drops, both parents were referred to complete a substance abuse assessment. However, Chanelle's referral was not submitted until October 2022 because she did not make herself available to Dent to sign the consents for the referral until that time. In February 2022, Charnell contacted Dent regarding the positive results from his January 2022 drug drop. Charnell contested the accuracy of the test, specifically suggesting that the drugs entered his system from sexual relations with Chanelle. In March 2022, Charnell was referred for his assessment, which he completed, and based on that assessment, DCFS did not make any further recommendations for Charnell as related to substance abuse. Nonetheless, Dent testified that she remained concerned regarding Charnell's substance abuse because he missed more drug drops than he completed during the time she was assigned to the case. Dent also testified that Chanelle only completed two drugs drops during her time on the case, and neither parent completed individual therapy during that time.

¶ 26    At the time Dent was assigned, the visitation schedule was for twice weekly supervised visits with both parents. However, from November 2021 to July 2022, neither parent visited

consistently, with Chanelle missing three or four visits each month and Charnell missing two or three visits each month.

¶ 27 At a permanency hearing on July 28, 2022, Dent testified that DCFS recommended that the goal be changed from return home to substitute care pending termination of parental rights. This recommendation was based on both parents' failure to complete services, lack of consistent drug drops, and lack of consistent visitation. After the goal was changed from return home, DCFS was no longer responsible for paying for the reunification services, and visitation was reduced to one visit per month. From July 2022 to December 2022, both parents were required to complete one drug drop per week, but Chanelle did not complete any during that time period and Charnell completed one. Individual therapy was also not completed by either parent during that time period; however, Charnell did begin individual therapy in October 2022 but attended only two sessions before he was unsuccessfully discharged.

¶ 28 Dent learned of an "unusual incident" during the September 2022 visit. Following a conversation with Michael Carter, the visitation supervisor, Dent spoke with her supervisor, and it was decided that visitation would be suspended until she was able to have a discussion with each parent. Dent mailed two letters to Charnell in order to set up a meeting, but he did not contact her until November 2022. Nonetheless, no meeting ever occurred. Dent met with Chanelle in October 2022, during which the September visit was discussed. Chanelle acknowledged that she was detained by police during the visit with C.B. and she was "very remorseful about it." Following that meeting, Chanelle's supervised visitation was reinstated, and Dent made referrals for Chanelle for a substance abuse assessment and individual therapy; however, Chanelle was placed on a waitlist for individual therapy.

¶ 29    In December 2022, Dent learned that Chanelle and Charnell were both in the Champaign County jail. Upon learning of their whereabouts, Dent sent letters to the parents. While Chanelle was in jail, Dent had monthly phone or video calls with her. Chanelle completed a substance abuse assessment in May 2023 while in the Champaign County jail, and the results of the assessment recommended inpatient substance abuse treatment for Chanelle. In June 2023, Chanelle was transferred to Logan Correctional Center. While there, Chanelle completed a substance abuse assessment and engaged in individual therapy, but Dent could not recall whether Chanelle successfully completed therapy. Drug drops were not available while she was incarcerated. Dent testified that Chanelle's inability to complete drug drops did not mean that the missed drops were considered positive but "her being incarcerated [was] still a barrier to completing the drug drop."

¶ 30    Although Charnell was moved to different facilities based on housing availability, Dent remained in contact with Charnell while he was in jail, speaking with him every two or three months. Charnell informed Dent that there were no services available for him at the jail.

¶ 31    While Chanelle and Charnell were in jail, both engaged in monthly virtual visitation with C.B. The visits were scheduled for an hour, but the actual length depended upon C.B.'s attention span. Neither parent sought in-person visitation with C.B. as they did not want him to see them in jail.

¶ 32    In October 2023, when Dent transitioned from caseworker to supervisor, Charnell's outstanding services were drug drops and individual therapy and Chanelle's were drug drops, individual therapy, and inpatient substance abuse treatment. Dent testified that, during her time on the case, due to the lack of progress in recommended services, she never recommended unsupervised visitation for either parent or that C.B. be returned to either parent's care.

¶ 33    On cross-examination by Chanelle's counsel, Dent testified that, during one meeting in October 2022, Chanelle stated that she was considering surrendering her parental rights. Dent further testified that, in her opinion, Chanelle was not compliant with services from November 2021 until her incarceration in December 2022.

¶ 34    On cross-examination by Charnell's counsel, Dent testified that in the January 2022 service plan, she rated Charnell as unsatisfactory for maintaining communication; however, she admitted that she was not provided with his contact information when she took over the case. On that service plan, she rated Charnell as satisfactory for visitation despite missing nine visits. In the June 2022 service plan, she rated Charnell as unsatisfactory as to visitation; however, one of his missed visits was due to COVID-19. In the June 2023 service plan, Dent rated Charnell as unsatisfactory as to communication with her as he had not responded to any of the letters she had sent him at the Champaign County jail. Upon further questioning as to the availability for communication for inmates, Dent testified that Charnell could initiate his own virtual visits with her where she would be informed that he wanted to speak with her and that other incarcerated clients were able to communicate with her. She further stated that the agency expected him to give reports regarding his visits with C.B., to inform them if services became available to him, and to generally communicate about his case.

¶ 35                                   4. Michael Carter

¶ 36    Michael Carter, a visitation supervisor, testified as to the "unusual" September incident. On September 18, 2022, C.B.'s birthday, Carter supervised a visit for the family. They first went to McDonald's and then to Meijer. While in Meijer, his parents told C.B. to pick out anything he wanted. After several items were placed in the cart, Carter asked if they had the money for everything and Charnell answered that they did. Charnell stated that he was going to pay for the

gifts and they (C.B., Chanelle, and Carter) should go to the "adventure park" nearby. Charnell later joined them and asked Carter if he could put the gifts in his trunk. Upon arriving at Carter's car, the police arrived and eventually both parents were "detained" by the police, at which point Carter terminated the visit. Carter testified that C.B. was visibly upset by what he had observed. After that incident, Carter continued to supervise visits with Chanelle and C.B. He testified that Chanelle is appropriate and consistent with the visits and she and C.B. appear to have a bond. Finally, Carter testified that C.B. often stated that he wants to go home with Chanelle at the end of visits.

¶ 37                                5. Ashler Uebele

¶ 38    Ashler Uebele, a DCFS case manager, was assigned to C.B.'s case in October 2023. At the time of his assignment, both parents were incarcerated. At the time of the hearing, Charnell was located at Jacksonville Correctional Center. At the time of his assignment, Chanelle's outstanding services were substance abuse assessment and any recommended services resulting therefrom, random drug drops, and individual therapy, and Charnell's outstanding services were random drug drops and individual therapy.

¶ 39    Charnell reported to Uebele that he will be released in 2028. As of the day of the hearing, Charnell had still not completed random drug drops or individual therapy, which Charnell had reported were not available to him while incarcerated.

¶ 40    Uebele testified that Chanelle was released in December 2023, at which time she entered a 28-day inpatient substance abuse treatment program, which she completed in January 2024. Afterwards, she engaged in outpatient substance abuse treatment. According to Uebele, individual therapy was still outstanding for Chanelle at the time of the hearing. On cross-examination by Chanelle's counsel, Uebele testified that he had not received reports of any positive drops since Chanelle was released. He also testified that, during virtual visits between Chanelle and C.B., he

observed that Chanelle was appropriate, C.B. called Chanelle "mommy," and there was a bond between them.

¶ 41                                6. Exhibits

¶ 42     During this phase of the hearing, the State entered a number of documentary exhibits into evidence, including the April 28, 2020 integrated assessment and service plans from the following dates: January 19, 2021; July 12, 2021; January 5, 2022; June 24, 2022; December 27, 2022; June 21, 2023.

¶ 43     The integrated assessment stated that this case was opened after C.B.'s bloodwork indicated he was "reactive" for a sexually transmitted infection and Chanelle subsequently failed to bring C.B. to medically necessary appointments. There were also reports of C.B.'s exposure to cocaine and methadone during Chanelle's pregnancy and Chanelle failed to make herself (or C.B.) available to DCFS during its investigation. Relevant here, the assessment stated that the "prognosis" for C.B. to be returned to Charnell's care was "guarded" because Charnell had "made no active efforts to parent [C.B.] or become involved in his life in a time of crisis (*i.e.* current DCFS involvement)."

¶ 44     The January 19, 2021 service plan indicated that the parents were visiting C.B. consistently but Chanelle had not submitted drug drops, completed a substance abuse assessment, or started parenting classes, and Charnell had not yet signed the consents to begin any services.

¶ 45     The July 12, 2021 service plan indicated that both parents had not attended visits with C.B. for two months, citing their respective employment as their reason for their absence, but they both recently re-engaged in visitation. The plan stated that Charnell was currently attending parenting classes, his random drug screening had not yet begun, and the caseworker had discussed with Charnell the available services for therapy "since he has medical insurance." As to Chanelle, the

plan indicated that she completed parenting classes, but she had not completed a substance abuse assessment despite a March 2021 referral to do so, and she had not engaged in any random drug drops since February 2021.

¶ 46    The January 5, 2022 service plan noted that Charnell had completed parenting classes in September 2021, but he was not engaged in any individual therapy services and was rated unsatisfactory for that service. Charnell was rated as satisfactory as to demonstrating learned parenting skills, despite missing approximately nine visits since July 2021. He was rated as unsatisfactory as to his participation in drug screens because he only completed three drug drops since the end of July 2021. As to Chanelle, the service plan noted that she was engaged in individual therapy and she was rated satisfactory for visitation, but she had not completed a substance abuse assessment and was rated unsatisfactory as to drug drops where she had missed 12 during the reporting period.

¶ 47    The June 24, 2022 service plan indicated that Charnell was referred for individual therapy in January 2022, but he remained on a waitlist. Charnell was rated satisfactory as to demonstrating learned parenting skills, but unsatisfactory as to visitation where he missed five visits during that reporting period. The plan indicated that Charnell was now required to complete drug drops weekly, as opposed to twice per month. He was rated unsatisfactory for weekly drug drops as he completed only five drops during that reporting period. As to Chanelle, the plan indicated that she was unsuccessfully discharged from individual therapy in June 2022 and she required a new referral. During this reporting period, Chanelle missed six visits with C.B. She was rated unsatisfactory as to substance abuse services, pointing to her January 2022 positive drug drop and her failure to complete any other drug drops during that reporting period.

¶ 48    The December 27, 2022 service plan indicated that both parents' visitation with C.B. was suspended in September, but Chanelle's visits resumed in December. As a result of the September incident, both parents were rated unsatisfactory for demonstration of learned parenting skills. Charnell was rated satisfactory for engaging in individual therapy as he had attended two sessions with a therapist; however, he was rated unsatisfactory for communication as he had failed to meet with his caseworker following the September visitation incident. The plan also noted that Charnell tested positive for cocaine in July and had not completed any drug drops since late October. The plan indicated that Chanelle was on the waitlist for individual therapy after being discharged in June and she had not completed any drug drops or her substance abuse assessment during that reporting period.

¶ 49    The June 21, 2023 service plan indicated that both parents remained incarcerated. As to Charnell, the plan indicated that he had not responded to the caseworker's letters. As to Chanelle, the plan noted that she remained in communication with the caseworker via letters and was participating in substance abuse treatment. It also noted that both parents had started monthly virtual visits with C.B.

¶ 50    The State rested.

¶ 51                                7. Chanelle

¶ 52    Chanelle's counsel first entered into evidence several documents indicating Chanelle's successful completion of inpatient substance abuse treatment (January 24, 2024), her successful completion of two parenting education programs (January 2023 and October 4, 2023), her successful completion of an anger management course (April 5, 2023), her successful completion of a financial education class (February 20, 2024), her attendance at alcoholics anonymous and narcotics anonymous meetings, and her completion of a "relapse prevention safety plan"

(December 30, 2023). Additionally submitted was a January 31, 2024 voucher for a two-bedroom unit in Champaign County, and a letter of support for Chanelle, indicating that she had 401 days of sobriety as of January 24, 2024 and she was "one of the most formidable candidates for an additional chance to work on the reunification services."

¶ 53    Chanelle testified that she participated in an outpatient treatment program, and she recently received a certificate of completion of that program, which included individual therapy. She also participated in random drug drops. She further testified that she consistently visited with C.B. virtually each month starting in June 2023, and since being released, she has been consistent with her monthly supervised visitation. Finally, Chanelle testified that during her treatment, she learned how drug use negatively affected children, and she learned how to live free of substance abuse and how to be a better parent.

¶ 54    That concluded the witness testimony and evidence from all parties for this portion of the termination proceeding.

¶ 55                                8. Court's Ruling

¶ 56    Following argument, the court found that the State had met its burden by clear and convincing evidence that both parents were unfit as to all grounds alleged and specifically all time periods alleged under ground (m). In coming to this conclusion, the court found the testimony of the caseworkers credible, and the court noted that the parents had been consistently rated unsatisfactory as to all services other than parenting classes for more than three years, which did not demonstrate reasonable progress. As to Chanelle, the court commended her for her diligent efforts towards her recommended services recently but pointed out her failure to engage in any service related to substance abuse for more than 18 months when that was the basis for C.B. being removed from her care in 2020. As to Charnell, the court found that grounds (b) and (m) were

supported by Charnell's lack of compliance with services, that Charnell's visitation history was inconsistent, and that Charnell was never deemed capable of unsupervised visits with C.B. The court also specifically found that Charnell had tested positive for cocaine twice. Notably, the court explicitly stated that it did not rely on the September incident in making its findings. The proceeding was then continued to January 14, 2025, to determine whether it was in C.B.'s best interest to terminate his parents' parental rights.

¶ 57                              C. Best Interest Hearing

¶ 58    On January 14, 2025, the trial court took judicial notice of the findings and evidence presented at the unfitness portion of the proceeding, and the following witness testimony was then presented.

¶ 59                              1. Lisa Barkstall

¶ 60    Lisa Barkstall, a DCFS supervisor, had been a supervisor on this case for various periods of time since 2020 and she was the supervisor at the time of the hearing. Because Uebele, the current case manager was on medical leave, Barkstall testified in his absence.

¶ 61    Barkstall testified that C.B. was residing with Yolande Murff Jackson, who is Chanelle's aunt. Other than his brief placement in a foster home closer to Champaign County, C.B. has consistently resided with Yolande, amounting to four years in total. Barkstall explained that Uebele and another case manager, Amanda Luebeck, have conducted foster home visits for this case and after doing so, their case notes would be entered into DCFS's case management system. The case notes for a December 18, 2024 visit indicated that there were no issues of concern and no unusual incidents were reported. The case notes also indicated that the case manager spoke with C.B. in private and no concerns were raised following that conversation. We note that these case notes were not entered into evidence as exhibits.

¶ 62    Barkstall testified that she has not had any concerns with C.B.'s placement with Yolande at any time during her assignment as a supervisor in this case and Yolande has remained committed to adopting C.B. She also stated that C.B. has bonded with Yolande and formed an attachment to this home. She concluded that the agency's recommendation was for termination of parental rights because it is in the best interest of C.B. to remain with Yolande.

¶ 63    On cross-examination by Chanelle's counsel, Barkstall testified that she had not personally observed any visitation between C.B. and Chanelle, but she has received reports from Yolande, as well as Uebele, who observed some visits. According to those reports, C.B. and Chanelle have "good interaction" during visits and C.B. calls Chanelle "mom." She stated that she does not know C.B.'s feelings regarding continued visitation with Chanelle, but she has not received any reports that he wants to discontinue visits. Barkstall also testified that Chanelle's home had passed inspection and there were no concerns regarding her living arrangements. Notably, counsel attempted to inquire about Chanelle's progress with services since the unfitness hearing. The State objected, and the court sustained the objection on the basis that Chanelle's completion of services was not relevant to the statutory best interest factors.

¶ 64    On cross-examination by Charnell's counsel, Barkstall testified that Uebele has been the supervisor for most of the virtual visits between Charnell and C.B. Based on Uebele's case notes, Barkstall understood that the visits are difficult as they have to "maintain the attention" of C.B. while on video. Barkstall was unable to provide an answer when asked whether C.B. calls Charnell "dad" and whether C.B. recognizes and is familiar with Charnell on the video calls. When asked about Yolande's health, she responded that she was unaware of anything related to her health.

¶ 65                              2. Yolande Murff Jackson

¶ 66    Yolande Murff Jackson testified that C.B. was placed in her care on January 10, 2020, removed from her care in July 2020, and returned to her care in July 2021. C.B. calls her either "Ya-ya" or "mommy," and C.B. is integrated with her extended family, including her grandchildren, who C.B. refers to as his brother and sister. She testified that she has a great deal of familial support. When asked why she wants to adopt C.B., she responded that she wants to give him stability, she loves him, and she believes that they are "a benefit to each other." She also testified that C.B. has asked her to adopt him. Yolande stated that, in September 2020, while C.B. was not in her care, she had some health issues and she was in a wheelchair for some time. She clarified that none of those health concerns prevent her from caring for C.B. She stated that C.B. recognizes Chanelle as his mom and Charnell as his dad. When asked about contact with Chanelle, Yolande responded that she was open to maintaining contact with her as long as she remains "sober and consistent." As to Charnell, Yolande stated that she was not, at that time, open to maintaining contact with him because he is incarcerated, but that could change depending on what happens in the future.

¶ 67    On cross-examination by Chanelle's counsel, Yolande testified that Chanelle's visits are appropriate, and she has not seen signs of substance abuse. She testified that she would maintain phone communication with Chanelle and that Chanelle also attends family gatherings where they can communicate. When asked whether she would be willing to bring C.B. to Chanelle's home for visits if Chanelle's rights were terminated, Yolande responded: "At some point in time. Right now that would be no." When asked why not, she responded: "Weather, traffic."

¶ 68    On cross-examination by Charnell's counsel, Yolande explained that she has been hospitalized twice since 2020 and that her son, who lives nearby, would watch C.B. if she was

hospitalized again. She also testified that C.B. has indicated on more than one occasion that he does not want to continue visits with Charnell.

¶ 69                                              3. Court's Ruling

¶ 70     Following argument, the court found that it is in C.B.'s best interest to terminate each parent's parental rights. In so finding, the court stated that all of the statutory factors supported this conclusion. The court specifically noted that Yolande has provided for C.B.'s physical safety and welfare for four years, C.B. feels an attachment to Yolande, and adoption by Yolande would provide C.B. with a sense of security, a continuity of affection, permanence, and would be the least disruptive placement for him. The court then addressed Chanelle's argument as to her recent progress with services. The court, noting that it had taken judicial notice of the unfitness findings, stated that Chanelle had not engaged in substance abuse treatment until after she was incarcerated, three years after this case began, and Chanelle had not consistently visited C.B. until recently.

¶ 71     That same day, a written order was entered, finding that, by clear and convincing evidence, Chanelle and Charnell are unfit based on grounds (b), (m), and (n), and it was in the best interest of C.B. to terminate each parent's parental rights.

¶ 72     This appeal followed.

¶ 73                                              II. ANALYSIS

¶ 74     On appeal, Charnell argues that the trial court's findings of unfitness were against the manifest weight of the evidence and Chanelle argues that the trial court's finding that termination of her parental rights was in C.B.'s best interest was against the manifest weight of the evidence. Relevant to this appeal, through its brief, the State has adopted the guardian *ad litem*'s (GAL) arguments, and as such, we refer solely to the arguments of the GAL.

¶ 75    "In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act." *In re E.B.*, 231 Ill. 2d 459, 463 (2008). Section 2-29 of the Juvenile Court Act provides for the involuntary termination of parental rights in a two-step, bifurcated process. 705 ILCS 405/2-29(2) (West 2024); *In re M.I.*, 2016 IL 120232, ¶ 20. First, the trial court must determine that the State has proved by clear and convincing evidence that the parent is unfit. *Id.*; 705 ILCS 405/2-29(2) (West 2024). Second, after a finding of unfitness has been made, the court then considers whether the State has demonstrated by a preponderance of the evidence that the termination of the parent's rights is in the best interest of the child. *M.I.*, 2016 IL 120232, ¶ 20.

¶ 76    The reviewing court is deferential towards the trial court's findings of fact because "the trial court is in the best position to observe the conduct and demeanor of the parties and witnesses, assess their credibility, and weigh the evidence." *In re Sharena H.*, 366 Ill. App. 3d 405, 415 (2006). We will not "reverse a trial court's decision to terminate parental rights unless it is contrary to the manifest weight of the evidence." *In re A.R.*, 2023 IL App (1st) 220700, ¶ 77. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). Each case involving the termination of parental rights is *sui generis* and must be decided on its own unique set of facts and circumstances. *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005).

¶ 77    Charnell's arguments relate solely to the unfitness findings, whereas Chanelle's arguments relate solely to the best interest finding. As Chanelle did not challenge the unfitness findings and Charnell did not challenge the best interest finding, those claims are now forfeited. See *In re M.R.*, 2020 IL App (1st) 191716, ¶ 26 (failure to challenge a finding results in forfeiture of that issue on appeal). We address each parent's arguments on appeal in turn.

¶ 78                                    B. Unfitness Findings

¶ 79     Charnell argues on appeal that the State failed to prove by clear and convincing evidence

that he was an unfit parent under grounds (b), (m)(i), (m)(ii), and (n).

¶ 80     "[I]t is well established that the grounds for finding parental unfitness under section 1(D)

of the Adoption Act stand independently of each other" (*In re Nicholas C.*, 2017 IL App (1st)

162101, ¶ 20) and therefore, "[o]nly one statutory ground is necessary to prove that a parent is

unfit" (*In re Tr.A.*, 2020 IL App (2d) 200225, ¶ 43). See *In re J.W.*, 2024 IL App (1st) 231918, ¶

20 ("any one ground, if properly proven, is sufficient to support a finding of parental unfitness").

Accordingly, we may affirm the trial court's judgment as to unfitness where the finding for any

one of the grounds is not against the manifest weight of the evidence. *Nicholas C.*, 2017 IL App

(1st) 162101, ¶ 20.

¶ 81     Because the admission of Charnell's positive drug drops is relevant to all grounds of

unfitness, we must preliminarily address that issue. Where the admission of evidence during the

parental rights termination hearing is at issue on appeal, we review the trial court's ruling for abuse

of discretion. *In re D.M.*, 336 Ill. App. 3d 766, 773 (2002). See *In re Z.J.*, 2020 IL App (2d)

190824.

¶ 82     Charnell first contends that the results from the January 28, 2022 drug drop were

inadmissible hearsay. The trial court admitted that evidence, over Charnell's objection, pursuant

to section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2024)), which is

"a variation of the common-law 'business records' exception to the hearsay rule." *In re A.B.*, 308

Ill. App. 3d 227, 235 (1999). That section provides:

     "Any writing, record, photograph or x-ray of any hospital or public or private agency,

     whether in the form of an entry in a book or otherwise, made as a memorandum or record

of any condition, act, transaction, occurrence or event relating to a minor in an abuse, neglect or dependency proceeding, shall be admissible in evidence as proof of that condition, act, transaction, occurrence of event, if the court finds that the document was made in the regular course of the business of the hospital or agency at the time of the act, transaction, occurrence or event, or within a reasonable time thereafter. A certification by the head or responsible employee or agent of the hospital or agency having knowledge of the creation and maintenance of or of the matters stated in the writing, record, photograph, or x-ray attesting that the document is the full and complete record of the condition, act, transaction, occurrence or event and that it satisfies the conditions of this paragraph shall be prima facie evidence of the facts contained in such certification. All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility." 705 ILCS 405/2-18(4)(a) (West 2024).

¶ 83    In sum, the proponent of a business record must show that "the writing was (1) made as a memorandum or record of the event, (2) made in the ordinary course of business, and (3) made at the time of the event or within a reasonable time thereafter." *A.B.*, 308 Ill. App. 3d at 235. Further, "[t]he author of the writing does not need to testify or be shown to be unavailable." *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 55.

¶ 84    The statutory foundational requirements were met in this case. Dent testified that the toxicology results were maintained on the DCFS's online case management system and the exhibit (a printout from that online system) clearly showed the date of the drug drop (January 28, 2022) and the date the document was printed (February 23, 2022), which was within a reasonable timeframe. Based on this testimony, it is clear that the foundational requirements were met, and

the trial court did not abuse its discretion in admitting evidence of the January 28, 2022 drug drop results.

¶ 85    Charnell also contends that the reference to a positive toxicology screening in the June 24, 2022 service plan, which the State properly admitted as an exhibit, was impermissible hearsay, and the trial court should not have relied on the results of that drug drop in its determination of unfitness. He concedes that there was no objection to the admission of this exhibit, and therefore, he requests that this court review his claim for plain error. The plain error doctrine allows this court to consider an unpreserved error where (1) a clear or obvious error occurred and (2) the evidence is so closely balanced that such error threatens to tip the scales of justice against the accused or the error is so serious that it affects the fairness of the trial. *Z.J.*, 2020 IL App (2d) 190824, ¶ 51. However, Charnell fails to explain how the admission of this evidence satisfies the two prongs of the plain error doctrine. As such, we find his hearsay challenge forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing.").

¶ 86    We begin our analysis with a focus on ground (b) under the Adoption Act.

¶ 87    Ground (b) as set forth in section 1(D) of the Adoption Act provides that a finding of unfitness may be based on the parent's "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare[.]" 750 ILCS 50/1(D)(b) (West 2024). The language of this section is disjunctive, meaning that unfitness may be based on a parent's failure to maintain a reasonable degree of interest *or* concern *or* responsibility for the child's welfare. *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 91. "A finding of unfitness under ground (b) is based on a subjective analysis[,]" which does not focus on the parent's success but on the reasonableness of his efforts in light of his particular circumstances. *Nicholas C.*, 2017 IL App (1st) 162101, ¶ 24.

Circumstances to consider may be "difficulty in obtaining transportation, the parent's poverty, statements made by others to discourage visitation, and whether the parent's lack of contact with the children can be attributed to a need to cope with personal problems rather than indifference towards them." *In re T.D.*, 268 Ill. App. 3d 239, 246 (1994). However, "[n]oncompliance with an imposed service plan, a continued addiction to drugs, a repeated failure to obtain treatment for an addiction, and infrequent or irregular visitation with the child have all been held to be sufficient evidence warranting a finding of unfitness under [ground] (b)." *In re Jaron Z.*, 384 Ill. App. 3d 239, 259 (2004).

¶ 88    As to ground (b), Charnell argues that the State failed to show by clear and convincing evidence that he failed to demonstrate interest, concern, and responsibility towards C.B. He contends that he completed parenting classes, and his visits were consistent enough to demonstrate his concern, interest, and responsibility for C.B.'s welfare. Further, his inability to participate in individual therapy until October 2022 was outside of his control, in that DCFS was not able to find an appropriate provider and the therapy service to which he was referred had a long waitlist. Additionally, according to Charnell, no evidence was presented at trial regarding the circumstances leading to his incarceration, and thus, that could not be relied upon in making this determination. Finally, he asserts that his failure to complete drug drops is not relevant to this ground because his March 2022 substance abuse assessment did not result in recommended substance abuse treatment, and thus, the drug drops were an unnecessary service. As we explain below, we do not find these arguments persuasive.

¶ 89    Here, the trial court found that ground (b) was supported by Charnell's lack of compliance with services, Charnell's inconsistent visitation history, his two positive tests for cocaine, and the lack of a recommendation for unsupervised visitation at any point in the case. The court made this

ruling without relying on the September incident or Charnell's current incarceration. Based upon our review of the record, and without reliance upon the September incident or Charnell's incarceration, we cannot conclude that the trial court's decision finding Charnell unfit under ground (b) was against the manifest weight of the evidence. Instead, we find that there was more than sufficient evidence in the record to support the court's finding.

¶ 90    The integrated assessment, the purpose of which is to identify the necessary reunification services, indicated that Charnell did not show an appropriate level of responsibility or concern for C.B. where he failed to involve himself in C.B.'s life as a parent "in a time of crisis," *i.e.* C.B.'s prenatal exposure to drugs, the diagnosis of a sexually transmitted infection, and C.B.'s subsequent medical appointments. As a result, the integrated assessment stated that Charnell needed "to actively engage in services aimed at reunification, ultimately taking responsibility for his role in the family's DCFS involvement." Following this assessment, Charnell's record with reunification services for the subsequent two years demonstrated a failure to maintain any reasonable degree of interest, concern, or responsibility for C.B.'s welfare.

¶ 91    We recognize that Charnell completed his parenting classes, which was one of three recommended services. However, he never completed the other two recommended services: drug drops and individual therapy. See *In re M.J.*, 314 Ill. App. 3d 649, 657 (2000) ("failure to comply with the directives of a service plan with the stated goal of returning a child home is tantamount to objectively unreasonable interest, concern, or responsibility as to the child's welfare").

¶ 92    Although the record suggests that the reunification services referral process finally began in July 2020, Charnell's referral for therapy seemingly lapsed by the time Foster was assigned the case in October 2020 and Charnell did not make himself available to Foster to sign consents for new referrals until June 2021. Apparently, there was then some issue with services regarding his

medical insurance. In any case, a new referral was once again submitted in February 2022, and he was placed on a waitlist until October 2022. Thus, the record does not support Charnell's assertion that his failure to complete therapy should not be held against him. His own delay in completing the referral process cannot be overlooked, and certainly, he would not have been on a waitlist until October 2022 had he engaged earlier. Moreover, once he was off the waitlist and was assigned a therapist, he missed at least three sessions prior to his incarceration. The therapist's court report regarding Charnell, which is included in the record on appeal, indicates he "no-call/no-showed" for appointments on October 18, October 25, November 1, and November 22. As such, the evidence regarding Charnell's unsatisfactory progress in individual therapy suggests a lack of interest, concern, and responsibility for C.B.'s welfare.

¶ 93 Charnell's unsatisfactory progress with random drug drops similarly demonstrates a lack of interest, concern, and responsibility for C.B. Charnell's random drug drops did not begin until after the July 2021 service plan. Although Foster testified that Charnell engaged in drug drops from September 2021 to November 2021, all of which were negative, the January 5, 2022 service plan indicated that he only completed three out of ten drug drops since the end of July 2021. Foster also testified that DCFS considered a missed drug drop as a positive drop and she explained the procedure for the random drug drops to Charnell multiple times. In 2022, he tested positive for cocaine twice. After he tested positive in January 2022, Charnell completed a substance abuse assessment; however, between January and June of that year, Charnell only completed five of his weekly drug drops. He then tested positive for cocaine again in July 2022, after which he did not complete another drug drop. This record of completing less than half of his recommended drug drops and testing positive for cocaine twice fails to demonstrate a reasonable degree of interest, concern, or responsibility for C.B.'s welfare.

¶ 94 Nonetheless, Charnell asserts that the random drug drops were an unnecessary service as the March 2022 substance abuse assessment did not result in any recommended services. We disagree with the inference drawn by Charnell regarding the discontinuation of recommended services. Dent testified that, based on Charnell's assessment, DCFS was not making any *further* recommendations. We infer from Dent's testimony that, given Charnell's several missed drops, services were simply no longer being recommended. Notably, prior to January 2022, Charnell was required to complete drug drops twice per month, but afterwards, his drug drops were increased to weekly. Additionally, Dent testified that DCFS remained concerned about Charnell's substance abuse because he missed more than half of his random drug drops, which are considered presumptively positive by DCFS. Although Charnell's substance abuse issues, in light of the assessment, may not have warranted inpatient treatment, like for Chanelle, the evidence clearly indicates that there *were* substance abuse issues and DCFS remained concerned about Charnell's use of substances. In any case, it is not for Charnell to determine which services are necessary for his reunification with C.B. Notwithstanding Charnell's belief that the services were unnecessary, compliance with the recommended services and satisfactory progress on service plans would have demonstrated his interest, concern, and responsibility as to the welfare of C.B. See *Gwynne P.*, 346 Ill. App. 3d at 591 ("Completion of service plan objectives also can be considered evidence of a parent's concern, interest, and responsibility.").

¶ 95 Finally, there does not appear in the record any service plan indicating that Charnell attended all scheduled visits with C.B. during any given reporting period. Certainly, perfect attendance is not required, and illness and transportation issues should be taken into account when reviewing Charnell's commitment to the visitation schedule. Even when considered, Charnell missed several visits each reporting period. In particular, the testimony showed that, on average,

between February 2021 and November 2021, Charnell visited with C.B. three out of eight times per month and, between November 2021 to July 2022, Charnell missed two to three visits per month. Additionally, after the September incident, Charnell made no active efforts in the months prior to his incarceration to resolve his visitation suspension. The evidence clearly shows that Charnell's visitation was not consistent enough, especially as he was never recommended for unsupervised visitation. Even were we to conclude that Charnell's visitation efforts were reasonably consistent, the other evidence of Charnell's lack of interest, concern, or responsibility for C.B.'s welfare precludes a finding that an opposite conclusion for this ground was clearly evident. See *Arthur H.*, 212 Ill. 2d 441, 464 (2004) ("A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident.").

¶ 96    Thus, even prior to his incarceration, Charnell's lack of progress with services, his inconsistent visitation with C.B., and his two positive tests for cocaine provided sufficient evidence for the trial court to conclude that Charnell was unfit pursuant to ground (b).

¶ 97    Additionally, even ignoring the basis for Charnell's incarceration, Dent testified that, while incarcerated, Charnell made little effort to communicate with her. When questioned about inmates' access to communication, Dent responded that she has other incarcerated clients who are more communicative and she expected Charnell to provide reports on his visits with C.B., to update her as to available services, and to generally communicate about the case. Charnell's failure to engage with Dent while incarcerated demonstrates a continued lack of interest, concern, and responsibility as to his reunification with and the welfare of C.B.

¶ 98    In sum, Charnell's conduct, as chronicled in this record, shows a failure to maintain a reasonable degree of interest, concern, or responsibility for C.B.'s welfare. Accordingly, the trial court's finding of unfitness under ground (b) was not against the manifest weight of the evidence.

¶ 99　Because only one ground of unfitness is necessary to sustain the court's finding, this court need not consider whether Charnell was unfit based upon any of the other grounds. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891 (2004). We now turn to Chanelle's claims on appeal.

¶ 100　　　　　　　　　　　C. Best Interest Finding

¶ 101　Chanelle argues that the court erred when it terminated her parental rights where it was not in C.B.'s best interest to do so.

¶ 102　As stated previously, after an unfitness finding is made, the State must then prove by a preponderance of the evidence that termination of parental rights is in the child's best interest. *In re D.T.*, 212 Ill. 2d 347, 366 (2004). "The purpose of a mandatory separate hearing on a child's best interests is to ensure proper focus on those interests, consideration of which is not relevant unless and until a parent is found unfit." *In re D.L.*, 326 Ill. App. 3d 262, 271 (citing *In re A.P.*, 277 Ill. App. 3d 593, 600 (1996)). As with unfitness findings, we will not disturb a best interest determination unless it is against the manifest weight of the evidence. *Jaron Z.*, 348 Ill. App. 3d at 261-62.

¶ 103　For a best interest determination, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home." *D.T.*, 212 Ill. 2d at 364. To that end, the Juvenile Court Act sets forth the following factors to be considered in making this determination:

"(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of

relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 68 (citing 705 ILCS 405/1-3(4.05) (West 2022)).

¶ 104    No single statutory factor is dispositive (*In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19), and the trial court need not explicitly reference each factor in announcing its decision (*In re M.W.*, 2019 IL App (1st) 191002, ¶ 61). Additionally, "evidence of a natural parent's earlier proven unfitness is a relevant, if not crucial, consideration." *D.L.*, 326 Ill. App. 3d at 271.

¶ 105    In the instant case, the trial court determined that the State had demonstrated by a preponderance of the evidence that termination of Chanelle's parental rights was in C.B.'s best interest. In doing so, the trial court referenced the most, if not all, of the best interest factors and noted that they weighed in favor of termination. Based on our review of the record, we conclude that this finding was not against the manifest weight of the evidence where the statutory factors, supported by sufficient evidence, weighed in favor of termination of Chanelle's parental rights.

¶ 106    First, Barkstall, as a DCFS supervisor, testified that C.B. had lived with Yolande for nearly four years, Yolande's home was appropriate and safe for C.B., C.B. and Yolande had a bond with one another, and Yolande remained committed to adopting C.B. As an aside, we disagree with Chanelle's suggestion that Barkstall's testimony was insufficient. Any gaps in Barkstall's testimony were filled by either Yolande's testimony or the testimony of the caseworkers in the unfitness hearing, of which the court took judicial notice.

¶ 107    Second, Yolande's testimony demonstrated her strong bond with C.B., her commitment to C.B. as an adoptive parent, and C.B.'s integration into her life. In particular, she testified that she loves C.B., wants to provide stability for him, and believes that they are "a benefit to each other."

Additionally, she testified that C.B. has asked her to adopt him. She also testified that she has a supportive extended family, who are able to care for C.B. when necessary and who have developed their own bond with C.B., as C.B. refers to Yolande's grandchildren as his brother and sister. This evidence presented at the hearing demonstrates that C.B.'s safety and welfare, C.B.'s identity, C.B.'s community and familial ties, C.B.'s sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative, C.B.'s wishes, C.B.'s need for permanence all weigh in favor of termination of parental rights and Yolande's adoption of C.B. As such, we cannot say that the trial court's finding was against the manifest weight of the evidence.

¶ 108 Moreover, the trial court expressly addressed the availability of options other than termination. The court highlighted that at no point during the five years since C.B. was removed from his parents' care had either parent ever been granted unsupervised visitation, let alone receive a recommendation that C.B. return home. In the court's view, return home was not an option, and guardianship was not the preferred care alternative where there already existed a safe and appropriate adoptive parent. See *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 33 (return home and adoption are statutorily preferred and guardianship is only available where those options have been excluded). For that reason, the court found that adoption was in C.B.'s best interest. See *In re Julieanna M.*, 2018 IL App (1st) 172972, ¶ 21 ("Adoption is given preference over guardianship when the natural parent cannot give proper care ***."). Accordingly, we do not find that the court erred in finding that termination of Chanelle's parental rights was in C.B.'s best interest.

¶ 109 In arguing that the court erred, Chanelle contends that there was sufficient testimony showing a strong bond between herself and C.B., which should have weighed against termination. Under a manifest weight of the evidence standard, we owe deference to the trial court, and we

must not substitute our judgment for that of the trial court regarding the weight to be given to the evidence. *In re D.F.*, 201 Ill. 2d 476, 498-99 (2002). Therefore, we will not question the weight the trial court gave to Chanelle and C.B.'s bond.

¶ 110    Additionally, the bond between the biological parent and the child is a relevant concern, but it does not singularly outweigh the other statutory factors. *In re L.G.*, 2015 IL App (1st) 241464, ¶ 39; see *In re Julian K.*, 2012 IL App (1st) 112841, ¶ 83. Nonetheless, Chanelle cites to *In re Angela D.*, 2012 IL App (1st) 112887, to argue that a child's bond with a biological parent can outweigh other factors. Significantly, in *Angela D.*, the reviewing court made it clear that that bond alone "does not compel a conclusion that termination was against the manifest weight of the evidence." *Id.* ¶ 39. As an example, the court suggested that the strength of the bond would weigh against termination "where there was no evidence that any benefit or increased stability would inure to the children upon termination." *Id.* ¶ 39. That is not applicable here, where there were clear benefits to termination, including stability and permanence for C.B. who has lived almost exclusively with Yolande for nearly his entire life.

¶ 111    Moreover, although there was evidence that Chanelle and C.B. had a bond and that C.B. recognized Chanelle as his mother, the record contains extensive testimony that C.B. had a strong bond with Yolande as well, to the extent that he also called Yolande "mommy." Chanelle provided nothing to refute the evidence that Yolande was an appropriate adoptive parent. Thus, evidence of C.B. and Chanelle's bond does not outweigh the other factors that weigh in favor of termination, and we will not reverse on this basis. See *L.G.*, 2015 IL App (1st) 241464, ¶ 39 (where the court's best interest decision was not against the manifest weight of the evidence, we will not reverse, even where there is evidence of one factor weighing against termination); *Tyianna J.*, 2017 IL App

(1st) 162306, ¶ 100 ("[e]ven if a bond exists, *** termination may still be proper if it would result in stability and permanency for the child").

¶ 112   Chanelle also contends that the court did not consider the extensive progress she had made in reunification services and substance abuse treatment since 2023. However, as the GAL points out in its brief, the court did, in fact, consider her efforts as it had taken judicial notice of all evidence presented at the unfitness portion of the proceeding. In its unfitness ruling, the court explicitly commended Chanelle on her recent progress and diligence in completing her reunification services. However, her failure to complete any substance abuse services during the first three years of C.B.'s life outweighed her recent efforts. Again, in its best interest ruling, the court specifically noted Chanelle's recent progress but stated that it took her three years to engage in any substance abuse treatment. It is clear that the court considered her progress but did not find it outweighed the statutory factors favoring termination of parental rights and adoption of C.B. See *Tajannah O.*, 2014 IL App (1st) 133119 (affirming the trial court's termination of parental rights, even though the mother and the child had an "extraordinary" bond and the mother had made recent progress in her reunification services and substance abuse treatment).

¶ 113   Further, we differ with Chanelle's characterization of the trial court as "appear[ing] disinterested" in evidence of her recent progress. Rather, the court sustained objections to the admission of *additional* evidence of Chanelle's progress because it was not permitted during the best interest hearing. A parent's fitness or lack thereof is no longer the focus of the proceeding; instead, the "child's best interest takes precedence over any other consideration, including the natural parent's right to custody." *Tajannah O.*, 2014 IL App (1st) 133119, ¶ 18; see *In re Tr.A.*, 2020 IL App (2d) 200225, ¶ 56 (the focus of the proceeding shifts to the child after a finding of unfitness). We reiterate that the court took judicial notice of the evidence presented at the unfitness

hearing, which included Chanelle's recent progress in services and completion of various treatment programs. Therefore, we do not find this argument persuasive.

¶ 114   Finally, we reject Chanelle's reliance on a recent unpublished decision, *In re Blaise M.*, 2025 IL App (5th) 240980-U (unpublished Rule 23 order). There, the Fifth District of this court reversed the trial court's termination of the mother's parental rights because of the minimal evidence presented by the State during the best interest hearing. *Id.* ¶ 59. To Chanelle's point, the mother did testify extensively as to her bond with the child, her progress with reunification services, and her continued efforts to correct the conditions that lead to the removal of the child. *Id.* ¶¶ 54-57. However, instead of presenting any witness testimony, the State only submitted a bare-bones report to the court. *Id.* ¶ 52. Additionally, the State failed to refute any of the mother's testimony. *Id.* ¶ 57. For that reason, the court found that the evidence presented favored a finding that the mother's parental rights not be terminated. *Id.* The circumstances of the best interest hearing in this case, however, are markedly different, where the State presented two witnesses: a qualified DCFS supervisor familiar with the case to testify as to the current conditions of C.B.'s placement with the foster mother and the foster mother herself who provided detailed testimony of C.B.'s life with her and her intentions for the future. Moreover, the child in *Blaise M.* exhibited behavioral issues seemingly related to his foster care placements, which is an issue not present in this case. *Id.* ¶ 53. Thus, *Blaise* is inapposite.

¶ 115   Ultimately, Chanelle has not claimed that any of the best interest factors should have been weighed against the foster mother. Rather, she only argues that the court should have weighed her continued bond with C.B. and her progress with services more heavily. Like the trial court, we recognize Chanelle's bond with C.B. and her recent sincere efforts to turn her life around. Nonetheless, the trial court appropriately considered the statutory best interest factors and

determined that it was in C.B.'s best interest to terminate Chanelle's parental rights. Based on the evidence in the record, we cannot find error in that decision.

¶ 116   In sum, the trial court's unfitness finding regarding Charnell (1-25-0200) and best interest finding regarding Chanelle (1-25-0122) were not against the manifest weight of the evidence. Therefore, we have no basis upon which to reverse the court's decision to terminate their parental rights.

¶ 117                               III. CONCLUSION

¶ 118   For the reasons stated, we affirm the judgment of the circuit court.

¶ 119   Affirmed.